**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**BLUEFIELD DIVISION**

**AMANDA MILLS,**

      **Plaintiff,**

**v.**                                                          **Case No.: 1:20-cv-00567**

**KILOLO KIJAKAZI,
Acting Commissioner of the
Social Security Administration,**

      **Defendant.**

**PROPOSED FINDINGS AND RECOMMENDATIONS**

This action seeks a review of the decision of the Commissioner of the Social Security Administration (hereinafter "Commissioner") denying Plaintiff's applications for a period of disability and disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f. The matter is assigned to the Honorable David A. Faber, United States District Judge, and was referred to the undersigned United States Magistrate Judge by standing order for submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are the parties' cross motions for judgment on the pleadings, as articulated in their briefs. (ECF Nos. 13, 14, 15).

For the following reasons, the undersigned **RECOMMENDS** that the Court **GRANT** Plaintiff's motion for judgment on the pleadings to the extent that it requests remand of the Commissioner's decision pursuant to sentence four of 42 U.S.C. § 405(g);

**DENY** Defendant's request to affirm the decision of the Commissioner; **REVERSE** the final decision of the Commissioner; **REMAND** this matter pursuant to sentence four of 42 U.S.C. § 405(g) for further administrative proceedings consistent with this PF&R; and **DISMISS** this case, **with prejudice**, and remove it from the docket of the Court.

## I.    <u>Procedural History</u>

On March 6, 2017, Plaintiff Amanda Mills ("Claimant") protectively filed for DIB and SSI, alleging a disability onset date of June 30, 2016, due to "ADHD, social anxiety, learning disability, no hand-eye coordination, and autoimmune disorder." (Tr. at 224-38, 250). The Social Security Administration ("SSA") denied Claimant's applications initially and upon reconsideration. (Tr. at 140-49, 152-57). Thus, Claimant requested an administrative hearing on her applications for benefits, which was held on July 10, 2019, before the Honorable David S. Lewandowski, Administrative Law Judge (the "ALJ"). (Tr. at 43-73). By written decision dated August 27, 2019, the ALJ found that Claimant was disabled as defined by the Social Security Act from April 15, 2017 through August 1, 2018. (Tr. at 15-21). However, the ALJ concluded that Claimant was not disabled from June 30, 2016 through April 14, 2017; that her disability ended on August 2, 2018; and that she had not become disabled again since that date. (Tr. at 21-31). The ALJ's decision became the final decision of the Commissioner on June 30, 2020, when the Appeals Council denied Claimant's request for review. (Tr. 1-6).

Claimant timely filed the present civil action seeking judicial review pursuant to 42 U.S.C. § 405(g). (ECF No. 2). The Commissioner subsequently filed an Answer opposing Claimant's complaint and a Transcript of the Administrative Proceedings. (ECF Nos. 9, 10). Claimant filed a Motion for Judgment on the Pleadings and Memorandum in Support, and the Commissioner filed a Brief in Support of Defendant's Decision. (ECF

Nos. 13, 14, 15). The time period within which Claimant could file a reply to the Commissioner's brief expired. Consequently, the matter is fully briefed and ready for resolution.

## II. **Claimant's Background**

Claimant was 25 years old on her alleged onset date and 29 years old on the date of the ALJ's decision. (Tr. at 110). She has completed high school, communicates in English, and does not have any past relevant work. (Tr. at 69, 249, 251).

## III. **Summary of ALJ's Decision**

Under 42 U.S.C. § 423(d)(5), a claimant seeking disability benefits has the burden of proving a disability. *See Blalock v. Richardson,* 483 F.2d 773, 775 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

The Social Security regulations establish a five-step sequential evaluation process for the adjudication of disability claims. If an individual is found "not disabled" at any step of the process, further inquiry is unnecessary, and benefits are denied. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The first step in the sequence is determining whether a claimant is currently engaged in substantial gainful employment. *Id.* §§ 404.1520(b), 416.920(b). If the claimant is not, then the second step requires a determination of whether the claimant suffers from a severe impairment. *Id.* §§ 404.1520(c), 416.920(c). A severe impairment is one that "significantly limits [a claimant's] physical or mental ability to do basic work activities." *Id.* If severe impairment is present, the third inquiry is whether this impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4 (the "Listing"). *Id.* §§ 404.1520(d),

3

416.920(d). If so, then the claimant is found disabled and awarded benefits.

However, if the impairment does not meet or equal a listed impairment, the adjudicator must assess the claimant's residual functional capacity ("RFC"), which is the measure of the claimant's ability to engage in substantial gainful activity despite the limitations of his or her impairments. *Id.* §§ 404.1520(e), 416.920(e). After making this determination, the fourth step is to ascertain whether the claimant's impairments prevent the performance of past relevant work. *Id.* §§ 404.1520(f), 416.920(f). If the impairments do prevent the performance of past relevant work, then the claimant has established a *prima facie* case of disability, and the burden shifts to the Commissioner to demonstrate, in the fifth and final step of the process, that the claimant is able to perform other forms of substantial gainful activity, given the claimant's remaining physical and mental capacities, age, education, and prior work experiences. 20 C.F.R. §§ 404.1520(g), 416.920(g); *see also McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983). The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy. *McLamore v. Weinberger*, 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the SSA "must follow a special technique at each level in the administrative review process," including the review performed by the ALJ. 20 C.F.R. §§ 404.1520a(a), 416.920a(a). Under this technique, the ALJ first evaluates the claimant's pertinent signs, symptoms, and laboratory results to determine whether the claimant has a medically determinable mental impairment. *Id.* §§ 404.1520a(b), 416.920a(b). If an impairment exists, the ALJ documents his findings. Second, the ALJ rates and documents the degree of functional limitation resulting from

4

the impairment according to criteria specified in 20 C.F.R. §§ 404.1520a(c), 416.920a(c). Third, after rating the degree of functional limitation from the claimant's impairment(s), the ALJ determines the severity of the limitation. *Id.* §§ 404.1520a(d), 416.920a(d). A rating of "none" or "mild" in the four functional areas of understanding, remembering, or applying information; (2) interacting with others; (3) maintaining concentration, persistence, or pace; and (4) adapting or managing oneself will result in a finding that the impairment is not severe unless the evidence indicates that there is more than minimal limitation in the claimant's ability to do basic work activities. *Id.* §§ 404.1520a(d)(1), 416.920a(d)(1). Fourth, if the claimant's impairment is deemed severe, the ALJ compares the medical findings about the severe impairment and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment meets or is equal to a listed mental disorder. *Id.* §§ 404.1520a(d)(2), 416.920a(d)(2). Finally, if the ALJ finds that the claimant has a severe mental impairment, which neither meets nor equals a listed mental disorder, the ALJ assesses the claimant's residual mental functional capacity. *Id.* §§ 404.1520a(d)(3), 416.920a(d)(3). The regulations further specify how the findings and conclusion reached in applying the technique must be documented by the ALJ, stating:

> The decision must show the significant history, including examination and laboratory findings, the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each of the functional areas described in paragraph (c) of this section.

*Id.* §§ 404.1520a(e)(4), 416.920a(e)(4).

If the claimant is found disabled at any point in the sequential evaluation process, the ALJ must determine whether the claimant's disability continued through the date of the decision. In order to find that the claimant's disability did not continue through the

date of the decision, the ALJ must show that medical improvement occurred which related to the claimant's ability to work, or that an exception applies. *Id*. §§ 404.1594(a), 416.994(a). In making that determination, the ALJ must follow an eight-step evaluation process for a DIB claim and a seven-step process for an SSI claim. The evaluation processes are essentially the same for DIB and SSI claims with the exception of the first step regarding substantial gainful activity, which applies only to DIB claims.

At step one of a DIB claim, the ALJ must determine whether the claimant is presently engaged in substantial gainful activity, and, if so, whether the claimant completed any applicable trial work period. *Id*. § 404.1594(f). If the claimant is employed and has completed a trial work period, his or her disability ends. *Id*. Otherwise, the evaluation proceeds to the next step. The ALJ considers at step two of a DIB claim and step one of a SSI claim whether the claimant has an impairment, or combination of impairments, which meets or equals an impairment in the Listing. *Id*. §§ 404.1594(f), 416.994(b). If the Listing is not satisfied, the ALJ considers at step three of a DIB claim and step two of an SSI claim whether there has been medical improvement as shown by a decrease in the medical severity of the impairment(s). *Id*. If the ALJ finds that medical improvement occurred, the ALJ evaluates at step four of the DIB claim and step three of the SSI claim whether the medical improvement related to the Claimant's ability to work. *Id*. If the ALJ determines that there was no medical improvement, or the medical improvement was not related to the claimant's ability to work, the ALJ considers at step five of a DIB claim and step four of an SSI claim whether an exception to medical improvement applies. *Id*. At step six of a DIB claim and step five of a SSI claim, the ALJ evaluates whether the claimant's current combination of impairments are severe. *Id*. If the impairments are severe, the ALJ assesses at step seven of a DIB claim and step six of

6

an SSI claim the claimant's RFC based upon the claimant's current impairments and also determines if the claimant can perform his or her past relevant work. *Id.* Finally, at step eight of a DIB claim and step seven of a SSI claim, the ALJ determines whether the claimant can perform other work that exists in significant numbers in the national economy given the claimant's RFC, age, education, and past work experience. *Id.* If the ALJ determines that the claimant can perform other work that exists in significant numbers in the national economy, the ALJ concludes that the claimant's disability ended. Otherwise, the claimant's disability continues.

Here, the ALJ determined as a preliminary matter that Claimant met the insured status for DIB through September 30, 2020. (Tr. at 15, Finding No. 1). At the first step of the sequential evaluation, the ALJ confirmed that Claimant had not engaged in substantial gainful activity since April 15, 2017, the date that Claimant became disabled. (*Id.*, Finding No. 2). At the second step of the evaluation, the ALJ found that from April 15, 2017, through August 1, 2018, Claimant had the following severe impairments: major depressive disorder, generalized anxiety disorder, borderline personality disorder, attention deficit hyperactivity disorder (ADHD), and autism spectrum." (*Id.*, Finding No. 3). The ALJ also considered Claimant's obesity, hyperlipidemia, and hypertension, but he found that the impairments were non-severe. (Tr. at 15). The ALJ further concluded that Claimant's autoimmune disorder and lack of hand-eye coordination were not medically determinable impairments. (Tr. at 16). Under the third inquiry, the ALJ found that from April 15, 2017 through August 1, 2018, Claimant did not have an impairment or combination of impairments that met or medically equaled any of the impairments contained in the Listing. (Tr. at 16, Finding No. 4). Accordingly, the ALJ determined that from April 15, 2017 through August 1, 2018, Claimant possessed:

> [T]he residual functional capacity to perform a full range of work. She could not understand, remember, and carry out simple instructions or perform simple tasks on a regular and consistent basis. She could have occasional interaction with the public. She was able to adapt to occasional changes in a customary workplace setting. She should have avoided fast-paced production or strict quota work. She would have been off task less than 15% of the workday.

(Tr. at 17-20, Finding No. 5).

At the fourth step, the ALJ determined that Claimant did not have any past relevant work. (Tr. at 20, Finding No. 6). Therefore, the ALJ reviewed Claimant's past work experience, age, and education in combination with her RFC to determine her ability to engage in other substantial gainful activity. (Tr. at 20-21, Findings 7 through 10). The ALJ considered that (1) Claimant was defined as a younger individual age 18-49 since her alleged onset date; (2) Claimant had at least a high school education and could communicate in English; and (3) transferability of job skills was not an issue because Claimant did not have past relevant work. (Tr. at 20, Findings 7 through 9). Taking into account these factors, Claimant's RFC, and the testimony of a vocational expert ("VE"), the ALJ determined that there were no jobs that existed in significant numbers in the national economy that Claimant could have performed from April 15, 2017 through August 1, 2018. (Tr. at 20-21, Finding No. 10). Consequently, the ALJ concluded that Claimant was disabled as defined by the Social Security Act from April 15, 2017 through August 1, 2018. (Tr. at 21, Finding No. 11).

The ALJ proceeded to determine whether medical improvement occurred. The ALJ found that from June 30, 2016 through April 14, 2017, and August 2, 2018 through the date of the ALJ's decision, Claimant's severe impairments were the same as they were during the period of her disability on April 15, 2017 through August 1, 2018. (*Id.*, Finding No. 12). The ALJ concluded that Claimant did not have an impairment or combination of

impairments that met or medically equaled any of the impairments contained in the Listing from June 30, 2016 through April 14, 2017, and August 2, 2018 through the date of the ALJ's decision. (Tr. at 22-24, Finding No. 13). Thus, the ALJ determined that from June 30, 2016 through April 14, 2017, and August 2, 2018 through the date of the ALJ's decision, Claimant possessed:

> [T]he residual functional capacity to perform a full range of work. She is able to understand, remember, and carry out simple instructions or perform simple tasks on a regular and consistent basis. She can have occasional interaction with the public. She is able to adapt to occasional changes in a customary workplace setting. She should avoid fast-paced production or strict quota work. She would be off task less than 15% of the workday.

(Tr. at 25-29, Finding No. 16).

For the periods of June 30, 2016 through April 14, 2017, and August 2, 2018 through the date of the ALJ's decision, the ALJ determined that Claimant still did not have past relevant work. (Tr. at 29, Finding No. 17). Therefore, the ALJ reviewed Claimant's past work experience, age, and education in combination with her RFC to determine her ability to engage in other substantial gainful activity. (Tr. at 29-30, Findings 18-21). The ALJ considered that (1) Claimant's age category had not changed since August 2, 2018; (2) Claimant's education level had not changed; and (3) transferability of job skills was not an issue because Claimant did not have past relevant work. (Tr. at 29, Findings 18-20). Taking into account these factors, Claimant's RFC, and the testimony of a VE, the ALJ determined that from June 30, 2016 through April 14, 2017, and August 2, 2018 through the date of the ALJ's decision, Claimant could perform other jobs that existed in significant numbers in the national economy, including work as a kitchen helper, maid, or hand packer. (Tr. at 29-30, Finding No. 21). Consequently, the ALJ concluded that Claimant was not disabled as defined by the Social Security Act and

was not entitled to benefits from June 30, 2016 through April 14, 2017, and beginning on August 2, 2018. (Tr. at 30, Finding No. 22).

## IV.    **Claimant's Challenges to the Commissioner's Decision**

Claimant asserts three challenges to the Commissioner's decision. First, Claimant argues that the ALJ's finding that she medically improved on August 2, 2018 is not supported by substantial evidence. (ECF No. 14 at 5-15). Second, Claimant contends that the ALJ did not meaningfully consider her severe impairments of ADHD, autism spectrum, and borderline personality disorder in assessing her RFC. (*Id.* at 15-19). Third, Claimant claims that the ALJ did not consider the side effects of her psychiatric medications, specifically excessive sedation. (*Id.* at 19-20).

In response to Claimant's challenges, the Commissioner asserts that the ALJ's finding of medical improvement was supported by substantial evidence, and the ALJ properly evaluated the opinion evidence, built a logical bridge to the RFC finding, and considered the alleged side effects of Claimant's medication. (ECF No. 15 at 10-20).

## V.    **Relevant Evidence**

The undersigned has reviewed all of the evidence before the Court. The following evidence is most relevant to the issues in dispute.

### *A. Treatment Records*

#### 1. **Closed period of disability**

On April 15, 2017, Claimant presented to the emergency room at Beckley ARH Hospital complaining of suicidal ideation and anxiety. (Tr. at 440). She had a self-inflicted healed wound on her left forearm. (*Id.*). Claimant's mood was depressed, but she was alert, oriented, and cooperative; displayed normal personal interaction; and showed good judgment. (Tr. at 440, 443). Claimant reported that she was chronically unemployed and

currently homeless. (Tr. at 442). She stated that her presenting problem started one week earlier, she had no significant prior psychiatric history, and she was not on any medications. (Tr. at 442, 887). Claimant was admitted for inpatient psychiatric treatment. (Tr. at 446).

Claimant explained that she became suicidal one day earlier when her parents disowned her. (Tr. at 889). She later described that her parents kicked her out of their home approximately two years ago when Claimant was 24 years old. (Tr. at 886). She initially moved in with an "abusive boyfriend," but was currently living in a homeless shelter where she was about to drink bleach when her roommate walked in, and Claimant went to the hospital. (Tr. at 889). Claimant exhibited depressed and anxious mood, expressed thoughts of drowning herself in the toilet, and reported auditory hallucinations. (Tr. at 890-91). However, she was alert with fair eye contact, memory, concentration, attention, insight, and judgment; calm and cooperative affect; and goal directed thought processes; and she denied visual hallucinations and delusions. (*Id.*). Claimant was enrolled in group therapy and prescribed medications, which were adjusted during her treatment. (Tr. at 886-87). Psychiatrist Jeffry T. Gee, M.D., diagnosed Claimant with adjustment disorder with mixed anxiety and depression, history of ADHD and cannabis use disorder, and borderline personality disorder. (Tr. at 887). He noted that other conditions must be ruled out, such as major depressive disorder with severe psychosis, generalized anxiety disorder, and malingering to avoid homelessness. (*Id.*). Claimant was discharged from inpatient treatment on April 26, 2017 to follow up with medication management and outpatient therapy. (Tr. at 887). She admitted that she malingered for the last five or six days of her treatment because she was unsure if she could return to the homeless shelter where she had been living. (*Id.*). Dr. Gee noted that

when Claimant discovered that there was a bed available for her at the shelter, her symptoms decreased significantly and she appeared much closer to baseline mental status, including brighter affect and more appropriate mood. (*Id.*). Thus, Dr. Gee was confident that Claimant could be released to less restrictive care. (*Id.*).

However, on May 5, 2017, Claimant returned to emergency room at Beckley ARH Hospital with suicidal ideation, and she was again admitted for inpatient treatment. (Tr. at 457, 459, 461, 562). Claimant stated that she had never been on psychiatric medication before and "was just not doing good on the new meds." (Tr. at 457). She was alert with clear speech, but she had flat affect and poor eye contact that was consistent with depression. (Tr. at 457, 460). When she was discharged on May 11, 2017, Claimant was calm and alert with good mood; appropriate affect; no suicidal or homicidal ideation, hallucinations, or delusion; and intact insight. (Tr. at 562).

Claimant again presented to the emergency room at Beckley ARH Hospital on May 19, 2017, due to suicidal ideation. (Tr. at 462, 557). She was alert with normal recent and remote memory and attention span, but she had poor judgment and appeared depressed. (Tr. at 558). Claimant allegedly tried to hang herself in the restroom while waiting in the emergency room. (Tr. at 462). Claimant was admitted for inpatient treatment and gradually improved with medication and supportive therapy. (Tr. at 467). She was discharged to her family on June 9, 2017, with instructions to take her medications and follow up with her primary care provider and a local mental health clinic on an outpatient basis. (Tr. at 468).

Claimant followed up with psychiatrist, Mohammad Hasan, M.D., on May 23, 2017. She stated that she still had depressive symptoms, but she was improving and doing well on her medications with no side effects. (Tr. at 582). Claimant was pleasant, alert,

and oriented in all spheres with normal speech, good mood and congruent affect, mostly logical and linear thought content, no suicidal ideation or hallucinations, and fair judgment and insight. (*Id.*).

On July 6, 2017, Claimant presented to the emergency room at Beckley ARH Hospital, stating that she tried to kill herself the day before after a fight with her boyfriend. (Tr. at 593). She had wounds on her arms from picking at her skin, and she was so agitated and angry that the staff had to place her in restraints. (*Id.*). Claimant was discharged to her mother on July 28, 2017, and her mother acknowledged that she would monitor Claimant, including controlling her medication. (Tr. at 598-90). Claimant's diagnoses included recurrent major depression that was more severe in nature, borderline personality disorder, and obesity. (*Id.*).

Claimant was evaluated as a new patient at Southern Highlands Community Mental Health Center ("Southern Highlands") on July 31, 2017. Claimant's mother reported that Claimant's medications were effective, but they caused excessive sedation, so she was only giving Claimant Ativan at night. (Tr. at 674). Claimant's mother related that Claimant saw a psychologist as a child, but she had no other treatment until a few months ago when she was admitted for inpatient treatment. (*Id.*). Claimant exhibited anxious mood, flat affect, and reported impairment in recent and remote memory, but she had normal speech and thought content and fair insight and judgment. (Tr. at 676).

On August 7, 2017, Claimant followed up with Lea Morgan, BSN, at Southern Highlands. She was nearly lethargic, falling asleep in the chair, and slurring words. (Tr. at 680). On examination, Nurse Morgan recorded that Claimant's mood was stable and she was cooperative, interacted well, denied hallucinations and suicidal ideation, and maintained direct eye contact. (Tr. at 680-81). However, Claimant's speech was difficult

13

to understand, and she displayed flat and blunted affect; poor insight, judgment, and recent and remote memory; vague thought content; and slow stream of thought. (*Id.*). Nurse Morgan decreased Claimant's medication, noting that it was causing sedation and involuntary muscle twitching. (Tr. at 681). She rated Claimant's energy level worse/poor. (*Id.*).

Three days later, on August 10, 2017, Claimant was more awake, alert, and coherent than her last visit with Nurse Morgan. (Tr. at 683). She had some tremors in her left hand, but she said that she felt better. (*Id.*). Claimant demonstrated flat affect, poor insight/judgment and remote memory, and slow stream of thought, but she was alert, cooperated and interacted well with appropriate speech and thought content, stable mood, fair recent memory, improved energy, direct eye contact, and no suicidal ideation. (Tr. at 683-84). Nurse Morgan again decreased Claimant's medication due to side effects. (Tr. at 684). She noted that Claimant's energy was improved, but she was still experiencing increased sedation. (*Id.*).

Nurse Morgan recorded the same allegations and findings on August 17, 2017, except that Claimant's mother stated that Claimant was doing "much better," and Claimant's insight/judgment and remote memory improved from poor to fair. (Tr. at 685-86). Overall, she had flat affect and slow stream of thought, but fair insight/judgment and recent and remote memory, and she was alert, cooperated and interacted well with appropriate speech and thought content, stable mood, improved energy, direct eye contact, and no suicidal ideation. (*Id.*). Claimant still experienced increased sedation and involuntary muscle twitching as side effects of medication, but the twitching was decreased, and her energy was improved. (Tr. at 686). Nurse Morgan again adjusted Claimant's medication. (*Id.*).

Claimant's mental status findings were the same on August 30, 2017. (Tr. at 687-88). She told Nurse Morgan that she was feeling better, her mood was stable, and she denied depression. (Tr. at 687). Claimant lived with her parents and had a boyfriend. (*Id.*). She still suffered increased sedation from medication, but her energy was improved. (Tr. at 688). On October 18 and November 15, 2017, Claimant again reported to Nurse Morgan that she was feeling better, her mood was stable, and she denied depression. (Tr. at 915, 917). She complained of some anxiety, tremors, and increased sedation from medication, but her energy was still improved. (Tr. at 915-18). There was no change in her mental status examination findings. (*Id.*).

Claimant began seeing a new provider, Misty Meadows, PA-C, at Southern Highlands on January 10, 2018. She reported that her medications were working well, but she felt more depressed because her aunt died. (Tr. at 919). Claimant's mental status examination findings were the same as her previous several visits, and PA-C Meadows continued Claimant's treatment plan. (Tr. at 919-20). Claimant had improved energy despite increased sedation from her medication. (Tr. at 920).

On March 7, 2018, Claimant told PA-C Meadows that she had a fight with her boyfriend and was suicidal that morning. (Tr. at 921). She had bleeding, self-inflicted excoriations on her forearm. (*Id.*). PA-C Meadows recorded the same mental status examination findings that Claimant had since August 17, 2017, and she noted Claimant's increased sedation from medication but improved energy. (Tr. at 921-22). Due to Claimant's suicidal ideation, PA-C Meadows called a crisis worker for assistance. (Tr. at 921). Claimant was taken to the emergency room at Princeton Community Hospital. (Tr. at 863). She acknowledged that she needed help immediately and was noted to be fully competent to make her own medical decisions. (Tr. at 864). Claimant was slightly

paranoid, but she exhibited no other signs of psychosis or flight of ideas, and her concentration was good. (*Id.*). She said that she was actively suicidal and would hurt herself if she went home. (*Id.*).

Thus, Claimant was transferred to Fairmont Regional Medical Center for inpatient care where psychiatrist James D. Abel, M.D., examined her on March 8, 2018. (Tr. at 758). Claimant reported a variety of mental symptoms, which she said profoundly worsened when she stopped taking her medication two weeks earlier because she did not think that it was helping. (*Id.*). On examination, Dr. Abel found that Claimant had fair insight and linear thought process, but depressed mood, blunted and depressed affect, slow and soft speech, poverty of thought, suicidal ideation, poor judgment, and concentration problems. (Tr. at 759-60). Dr. Abel prescribed medications. (Tr. at 760). He discharged Claimant from inpatient treatment on March 27, 2018. At that time, Claimant demonstrated euthymic mood; appropriate, but blunted, affect; no hallucinations; linear thought process; and fair insight, but she had poor judgment, slow and soft speech, poverty of thought, and concentration problems. (Tr. at 754).

During Claimant's regular check up with her primary care provider, Sabrina Huffman, FNP-BC, on April 11, 2018, Claimant stated that she was doing well. (Tr. at 733). She shared that she was hospitalized for three weeks for mental issues and was following up with a psychologist at Southern Highlands, noting that she was "stable currently." (*Id.*). Nurse Huffman did not document psychiatric complaints or findings. (Tr. at 733-34). On May 9 and June 8, 2018, PA-C Meadows noted that Claimant looked well; her mood was good; she denied depression or thoughts of self-harm; the excoriations on her arms were healed; and she was taking her medications every day. (Tr. at 923, 926). Claimant's mental status examination findings were remained the same as they were since

August 17, 2017, and she experienced increased sedation from medication, but her energy was improved. (Tr. at 923-24, 926-27).

There were no changes noted in Claimant's clinical record on July 6, 2018, other than Claimant's report that she missed two doses of medication and thought about cutting herself after a break-up. (Tr. at 929). PA-C Meadows documented the same mental status examination findings dating back to August 17, 2017, and Claimant still experienced increased sedation, but her energy was improved. (Tr. at 929-30). On August 1, 2018, Claimant told PA-C Meadows that she had some decreased energy and thought about cutting herself, but she did not act on the impulses, noting that she crocheted to avoid self-harm. (Tr. at 932). Claimant was in a new relationship and expressed happy affect, but otherwise had the same mental status. (Tr. at 932-33). Her medication was still causing sedation, and her energy had worsened to poor. (Tr. at 933).

### 2.  After medical improvement

Claimant presented to Nurse Huffman for follow up on August 10, 2018. (Tr. at 730). She reported that she was doing well and was still receiving mental health treatment at Southern Highlands. (Tr. at 730). Claimant was somewhat of a poor historian regarding her medical history. (Tr. at 730). Nurse Huffman did not document psychiatric complaints or findings. (Tr. at 730-31).

Later that month, on August 29, 2018, Claimant told PA-C Meadows that she felt more down, missed medication one morning, was not doing crafts as much, had thoughts of cutting, and experienced suicidal ideation on Saturday and cut herself. (Tr. at 935). During that visit and Claimant's subsequent visits on September 21 and October 26, 2018, PA-C Meadows documented the same mental status examination findings that she recorded since August 17, 2017, with the exception of Claimant's happy affect and poor

energy. (Tr. at 935-36, 938-29, 941-42). Specifically, Claimant had slow stream of thought and poor energy, but happy affect, fair insight/judgment and recent and remote memory, and she was alert, cooperated and interacted well with appropriate speech and thought content, stable mood, direct eye contact, and no suicidal ideation. (*Id.*). Claimant still experienced increased sedation from medication. (Tr. at 936, 939, 942). She denied depression and thoughts of self-harm on October 26, 2018, and she stated that she was doing fair. (Tr. at 941). On November 12, 2018, Claimant followed up with Nurse Huffman, reporting that she was doing well without any problems. (Tr. at 723). Nurse Huffman did not record psychiatric complaints or findings. (Tr. at 723-24).

On November 21, 2018, Claimant's mood was stable. (Tr. at 944). She told PA-C Meadows that she was excited about Thanksgiving, and had not engaged in self-harm. Her energy was good, she was taking her medications, and she was not sleeping at night but was sleeping during the day. (*Id.*). However, PA-C Meadows also recorded that Claimant suffered increased sedation from medication and had poor energy. (*Id.*). PA-C Meadows documented the same mental status examination findings as Claimant's previous visit, and she added a notation that Claimant was "not stable for employment." (Tr. at 944-45). There were no changes during Claimant's follow-up appointments with PA-C Meadows on December 21, 2018 and February 8, 2019, except that Claimant stated during the December visit that she had depressed mood because she did not have a boyfriend and she looked forward to fishing on the date of her February appointment. (Tr. at 947-48, 950-51). Nurse Huffman examined Claimant on February 27, 2019, but she did not document psychiatric complaints or findings. (Tr. at 901-02).

Claimant presented to the emergency room at Princeton Community Hospital on June 2, 2019. She complained of auditory hallucinations and had been self-mutilating for

two weeks. (Tr. at 856). Claimant was anxious, withdrawn, exhibited very poor eye contact and communication, and scratched at her arm until she broke the skin. (Tr. at 857). Claimant's mother believed that she had not been compliant with medications. (Tr. at 871). Claimant was admitted for inpatient psychiatric treatment, and she was very combative and had to be restrained and given injections multiple times during her treatment. (Tr. at 871). However, the treating psychiatrist noted that, "after her medications were changed, she became much more calm and was much easier to be redirected." (*Id*.). Claimant was diagnosed with schizoaffective disorder, bipolar type; depressed episode of acute psychosis and suicidal ideation; generalized anxiety disorder; post manic stress disorder secondary to trauma; and borderline personality disorder. (Tr. at 871-72). She was discharged on June 10, 2019, in stable condition to "see how she [did] on an outpatient basis." (Tr. at 871).

### B. Evaluations and Opinions

Psychologist Kelly Robinson, M.A., examined Claimant on August 1, 2017. Claimant had bruises, bite marks, and cuts on her arms. (Tr. at 662). Her speech was fair with slow rate and normal volume. (*Id*.). She was lethargic; exhibited psychomotor retardation, dysphoric mood, and restricted affect; reported hallucinations; and made three errors during the serial 3's test. (Tr. at 665). However, she did not express suicidal ideation and had normal thought processes; judgment; and immediate, recent, and remote memory. (*Id*.). Claimant's daily activities consisted of taking medication, talking to her boyfriend on the phone, talking to her family, watching television, using Facebook, listening to music, watching YouTube videos, heating up and eating food, and feeding her dog. (Tr. at 667-68). She said that she could not do anything else because her mom had her "sheltered like a rat." (Tr. at 668). Ms. Robinson recorded that Claimant had a full

scale IQ of 76 on the WAIS-IV test, but the result was considered invalid because of Claimant's persistence, pace, motor behavior, and mood. (Tr. at 666). Claimant was very lethargic, had a slow pace, was uninterested in portions of the test, lacked adequate motivation, and required constant encouragement and repetition of instructions. (Tr. at 666, 668).

On September 2, 2017, psychologist Debra Lilly, Ph.D., performed a psychiatric review technique based upon her review of Claimant's records. She assessed that Claimant was moderately limited in all of the paragraph B criteria, including understanding, remembering, and applying information; interacting with others; concentrating, persisting, or maintaining pace; and adapting or managing herself. (Tr. at 83, 101). Dr. Lilly also assessed Claimant's mental RFC, concluding that Claimant was moderately limited in understanding, remembering, and carrying out detailed instructions; maintaining attention and concentration for extended periods; performing activities within a schedule, maintaining regular attendance, and being punctual within customary tolerances; completing a normal workday and workweek without interruptions from psychologically based symptoms and performing at a consistent pace without an unreasonable number and length of rest periods; interacting appropriately with the general public; and responding appropriately to changes in the work setting. (Tr. at 86-87, 104-05). Paula J. Bickham, Ph.D., affirmed Dr. Lilly's findings on January 30, 2018. (Tr. at 117, 119-21, 132, 134-36).

Both Dr. Lilly and Dr. Bickham noted that Claimant had a history of learning disorder, and, although she reported a variety of activities, she had issues with persistence and pace. (Tr. at 87, 105, 120, 135). Therefore, the experts assessed that Claimant would be best suited to situations in which she did not have high production demands. (*Id*.). The

psychologists also noted that Claimant avoided crowds to some extent, and they assessed that Claimant could interact appropriately with coworkers and supervisors, but she should have limited interaction with the general public. (*Id.*). Finally, Dr. Lilly and Dr. Bickham assessed that Claimant had limited ability to change work activities or sites frequently. (Tr. at 87, 105, 121, 136).

On March 30, 2018, Dr. Abel opined that Claimant lacked capacity and should be appointed a guardian or conservator based on his evaluation of Claimant during her inpatient treatment from March 3 through 27, 2018. (Tr. at 715). He stated that her incapacity resulted from intellectual and developmental disability along with autism spectrum disorder and severe depression. (*Id.*). Dr. Abel expressed that Claimant had significant difficulty managing her own affairs and making appropriate decisions for herself, she lived with her parents who provided full care for her, and she was entirely unable to live on her own. (Tr. at 715-16).

### C. Claimant's Statements

Claimant completed a function report on March 28, 2017. She stated that she helped her parents clean her grandmother's house, take her grandmother to the doctor, and care for pets. (Tr. at 260). She noted that she had to be reminded to get dressed, bathe, care for her hair, and take her medicine. (Tr. at 260-61). She could make sandwiches and microwave food, but she required reminders. (Tr. at 261). She liked to knit and watch television. (Tr. at 263). Claimant alleged that she could not follow instructions well. (Tr. at 264).

On November 16, 2017, Claimant completed another function report. She again stated that she needed reminders to bathe, care for her hair, and take medicine. (Tr. at 316-17). She could do the dishes if reminded. (Tr. at 317). Claimant stated that she could

go out alone, but she could only walk and could not drive. (Tr. at 318). She shopped for food in stores. (*Id*.). She still enjoyed knitting and watching television. (Tr. at 319). She assessed that she could follow instructions okay. (Tr. at 320).

Claimant's mother testified during Claimant's administrative hearing on July 10, 2019. She stated that Claimant had problems since birth, was assigned a special education aide when she was younger, and was placed in special education classes beginning in sixth grade. (Tr. at 49). According to Claimant's mother, Claimant could barely read or write and had poor memory. (*Id*.). After graduating, Claimant got a job washing dishes in a cafeteria, but the employer had to provide assistance for Claimant to do the job. (Tr. at 49-50). Claimant's mother testified that she had to help Claimant with normal daily tasks relating to food and clothing and making sure that Claimant was clean after showering and using the bathroom. (Tr. at 51). She stated that she had to direct Claimant all day, every day, and it had been that way for Claimant's entire life. (Tr. at 51-52). Claimant's mother testified that she also had to monitor Claimant's medication, or she would not take it. (Tr. at 57). She noted that Claimant's providers had to adjust Claimant's medication all of the time, and Claimant sometimes ended up in the hospital even when she was fully compliant with medication. (Tr. at 59).

Claimant likewise testified during her administrative hearing that she required help in her past job and in school. (Tr. at 65-66). She stated that she had auditory and visual hallucinations. (Tr. at 67). Claimant acknowledged that her medication helped her mental symptoms "to a point." (*Id*.). However, she explained that she still had suicidal ideation when she was feeling depressed. (Tr. at 68). In terms of hobbies, Claimant stated that she liked to do arts and crafts, such as crochet. (*Id*.).

## VI.    Scope of Review

The issue before the Court is whether the final decision of the Commissioner is based upon an appropriate application of the law and is supported by substantial evidence. *See Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). The United States Court of Appeals for the Fourth Circuit ("Fourth Circuit") defined "substantial evidence" to be:

> [E]vidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Blalock*, 483 F.2d at 776 (4th Cir. 1973) (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). When examining the Commissioner's decision, the Court does not conduct a *de novo* review of the evidence to ascertain whether the claimant is disabled. *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)). Instead, the Court's role is limited to ensuring that the ALJ followed applicable Regulations and Rulings in reaching his decision, and that the decision is supported by substantial evidence. *Hays*, 907 F.2d at 1456. If substantial evidence exists, the Court must affirm the Commissioner's decision "even should the court disagree with such decision." *Blalock*, 483 F.2d at 775.

## VII.    Discussion

All of Claimant's challenges concern the ALJ's RFC finding to some degree. SSR 96-8p instructs an ALJ how to properly assess a claimant's RFC, which is the claimant's "ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis." SSR 96-8p, 1996 WL 374184, at *1. RFC is a measurement of the ***most*** that a claimant can do despite his or her limitations resulting from both

severe and non-severe impairments, and the finding is used at steps four and five of the sequential evaluation to determine whether a claimant can still do past relevant work and, if not, whether there is other work that the claimant is capable of performing. *Id*. According to the Ruling, the ALJ's RFC determination requires "a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities." *Id*. at *3.

The functions which the ALJ must assess include a claimant's physical abilities, such as sitting, standing, walking, lifting, carrying, pushing, pulling, or other physical functions (including manipulative or postural functions, such as reaching, handling, stooping, or crouching); mental abilities, such as understanding, remembering, and carrying out instructions and responding appropriately to supervision, coworkers, and work pressures in a work setting; and other abilities, such as seeing and hearing. 20 CFR §§ 404.1545(b)-(d), 416.945(b)-(d)

Only by examining specific functional abilities can the ALJ determine (1) whether a claimant can perform past relevant work as it was actually, or is generally, performed; (2) what exertional level is appropriate for the claimant; and (3) whether the claimant "is capable of doing the full range of work contemplated by the exertional level." SSR 96-8p, 1996 WL 374184, at *3. Indeed, "[w]ithout a careful consideration of an individual's functional capacities to support an RFC assessment based on an exertional category, the adjudicator may either overlook limitations or restrictions that would narrow the ranges and types of work an individual may be able to do, or find that the individual has limitations or restrictions that he or she does not actually have." *Id*. at *4. In determining a claimant's RFC, the ALJ "must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g. laboratory findings)

and nonmedical evidence (e.g., daily activities, observations)." *Id.* at *7. Further, the ALJ must "explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved." *Id.* at *7.

While an ALJ is not required to explicitly discuss "irrelevant or uncontested" functions, "[r]emand may be appropriate where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review." *Mascio v. Colvin*, 780 F.3d 632, 636 (4th Cir. 2015) (quoting *Cichocki v. Astrue*, 729 F.3d 172, 177 (2d Cir. 2013)) (markings omitted).

### A. Medical Improvement

In her first challenge to the Commissioner's decision, Claimant argues that substantial evidence does not support the ALJ's determination that her mental impairments medically improved. As noted, there is no presumption of continuing disability under the Social Security Act. Therefore, when an ALJ determines during the sequential evaluation process that a claimant is disabled, the ALJ must consider whether the claimant's disability continues through the date of the decision. *Czerska v. Colvin*, No. CIV.A. TMD 12-2238, 2013 WL 5335406, at *1 (D. Md. Sept. 20, 2013). "A closed period of disability is the period of disability with a definite beginning date and a definite ending date that the adjudicator establishes at the time of adjudication." Program Operations Manual (POMS) DI 25510(A), *available at* http://pomsresource.org/poms/DI-25510.001/closed-period. If an ALJ determines that a claimant was disabled for a closed period, or when the Commissioner periodically conducts a continuing disability review to determine whether a claimant who is receiving disability benefits is still entitled to those payments, the SSA evaluates whether there has been medical improvement in the

claimant's impairments and, if so, whether the medical improvement related to the claimant's ability to work. 20 C.F.R. §§ 404.1594(a), 416.994(b); *Connie J. v. Comm'r of Soc. Sec.*, No. 4:18-CV-00059, 2020 WL 2814181, at *2 (W.D. Va. May 14, 2020), *report and recommendation adopted,* 2020 WL 2812831 (W.D. Va. May 29, 2020).

"Medical improvement" is defined as any decrease in the medical severity of the claimant's impairment(s) that was present at the time of the most recent favorable medical decision that the claimant was disabled or continued to be disabled. 20 C.F.R. §§ 404.1594(b)(1), 416.994(b)(1)(i). However, for closed period cases, the point of comparison is the established onset date set (the date that the ALJ determined that the claimant became disabled). POMS DI 28010.105(B)(3)(a), *available at* https://secure.ssa.gov/poms.nsf/lnX/0428010105. Medical improvement must be shown by improvement in the symptoms, signs, and/or laboratory findings associated with the impairment(s). 20 C.F.R. §§ 404.1594(b)(1), 416.994(b)(1)(i). "Symptoms" include a claimant's own description of his or her physical or mental impairments. *Id.* §§ 404.1502(i), 416.902(n). "Signs" are "anatomical, physiological, or psychological abnormalities established by medically acceptable clinical diagnostic techniques that can be observed apart from an individual's symptoms." *Id.* §§ 404.1502(g), 416.902(l). Finally, "laboratory findings" are "anatomical, physiological, or psychological phenomena, which can be shown by the use of medically acceptable laboratory diagnostic techniques." *Id.* §§ 404.1502(c) and 416.902(g). "Diagnostic techniques include chemical tests (such as blood tests), electrophysiological studies (such as electrocardiograms and electroencephalograms), medical imaging (such as X–rays), and psychological tests." *Id.*

In this case, the ALJ determined that Claimant was (1) not disabled from her alleged onset date on June 30, 2016 through April 14, 2017; (2) disabled from April 15,

2017 through August 1, 2018 (hereinafter "the closed period of disability"); and (3) not disabled from August 2, 2018 through the date of the ALJ's decision (hereinafter the "period of medical improvement"). (Tr. at 21, 30). This challenge focuses on whether Claimant improved after the closed period of disability.

Regarding the closed period of disability, the ALJ cited Claimant's inpatient psychiatric treatment in April, May, and July 2017 and March 2018. (Tr. at 17-19). The ALJ discussed Claimant's improvement between the hospitalizations and remarked that when Claimant followed up with her psychiatrist on May 9, 2018, Claimant reported that she had been taking her medication every day; her mood was good; she denied depression and hallucinations; and she had appropriate speech, fair insight and judgment, stable mood, fair recent and remote memory, and logical but slow stream of thought and flat affect. (*Id.*). The ALJ further cited that Claimant reported on August 1, 2018, that she was in a new relationship and happy; managed thoughts of cutting herself by crocheting; was sleeping and eating well; had some decreased energy and slow but logical stream of thought; and normal mental status examination findings otherwise. (*Id.*).

The ALJ gave some weight to the opinions of the state agency psychologists for the closed period of disability, but the ALJ found that Claimant was more limited than the experts assessed in the respect that Claimant's ability to concentrate and maintain pace was markedly limited. (Tr. at 19). The ALJ explained that Claimant received generally consistent treatment during the closed period of disability, and there were many objective signs of abnormalities during that period. (*Id.*). He gave some weight to the opinion of Claimant's psychiatrist, Dr. Abel (incorrectly referred to in the decision as Dr. Noel), that Claimant had significant cognitive and functional limitations. (Tr. at 19-20). The ALJ gave the opinion some weight for the closed period of disability because Claimant had multiple

inpatient hospitalizations and mental status abnormalities during that period. (Tr. at 20).

Ultimately, the ALJ determined that, during the closed period of disability Claimant had the RFC to perform a range of work, but Claimant could not understand, remember, and carry out simple instructions or perform simple tasks. (Tr. at 16). Based on the testimony of a VE, the ALJ concluded that there were no jobs that Claimant could perform during that period. (Tr. at 21).

The ALJ found that Claimant medically improved beginning on August 2, 2018, because "reports indicated improvement in her mental status examination findings." (Tr. at 27). The ALJ stated that Claimant's symptoms were generally controlled when she took her medications as prescribed, and her mental status examinations were largely normal during her monthly visits with her psychiatrist. (*Id.*). Specifically, the ALJ cited that, other than Claimant's slow but logical thought process, Claimant's providers documented Claimant's stable mood; happy affect; appropriate speech; fair insight, judgment, and recent and remote memory; appropriate and normal thought content; alert cognitive functioning; and direct eye contact, and Claimant interacted well and was cooperative. (*Id.*). The ALJ acknowledged that Claimant had one psychiatric hospitalization in June 2019 after she medically improved, but the ALJ attributed it to the fact that Claimant had been out of medication for two weeks. (*Id.*).

The ALJ gave little weight to Dr. Abel's opinion concerning the period of medical improvement, finding that his opinion was not consistent with the overall record during that period. (Tr. at 28). In support, the ALJ provided the same reasons that Claimant's "functioning improved once her medications were stabilized in August 2018," "she had largely normal mental status examination findings," and her June 2019 hospitalization was due to "medication non-compliance." (*Id.*).

28

The ALJ also considered the statements from PA-C Meadows in November and December 2018 and February 2019 that Claimant was not stable for employment. (Tr. at 29). However, the ALJ concluded that it was unclear whether the statements documented Claimant's assertion or PA-C Meadows's opinion. (*Id.*). To the extent that it was PA-C Meadows's opinion, the ALJ gave it no weight on the basis that the contemporaneous examination findings showed that Claimant interacted well and was cooperative and had stable mood; happy affect; appropriate speech; fair insight, judgment, and recent and remote memory; appropriate and normal thought content; alert cognitive functioning; and direct eye contact. (*Id.*). Further, the ALJ gave the opinion no weight because (1) the ALJ found it to be inconsistent with the fact that Claimant's primary care provider did not document mental health complaints or objective abnormalities and (2) the issue of whether Claimant could work was reserved to the Commissioner. (*Id.*).

The ALJ concluded that beginning on August 2, 2018, Claimant had the same RFC limitations as the closed period of disability except that Claimant could understand, remember, and carry out simple instructions and perform simple tasks. (Tr. at 25). Based on the testimony of a VE, the ALJ found that there were jobs that Claimant could perform that existed in significant numbers in the national economy. (Tr. at 30).

The undersigned finds that the ALJ's rationale for concluding that Claimant medically improved on August 2, 2018 is misleading and inadequate. The ALJ stated that Claimant's mental status examination findings improved on August 2, 2018. However, with the exception of Claimant's happy affect, the mental status examination findings that the ALJ referenced were mostly the same during the closed period of disability. The ALJ cited that Claimant's providers documented that Claimant interacted well and was cooperative with slow, but logical, thought process; stable mood; appropriate speech; fair

insight, judgment, and recent and remote memory; appropriate and normal thought content; alert cognitive functioning; and direct eye contact. (*Id.*). With a few exceptions, those findings were unchanged. (Tr. at 440, 443, 457, 558, 460, 562, 582, 676, 680-81, 683-88, 754, 759-60, 890-91, 915-20, 923-24, 926-27, 929-30, 932-33). Thus, the ALJ failed to explain how the mental status examination findings which he cited represented an improvement in the severity of Claimant's impairments.

Furthermore, the ALJ mischaracterized some of the evidence in support of his conclusion that Claimant medically improved. For instance, the ALJ stated that Claimant did not have any mental status abnormalities on August 10, 2018. (Tr. at 26). However, on August 10, 2018, Claimant saw her primary care provider, Nurse Huffman, for physical complaints, and Nurse Huffman did not evaluate Claimant's mental complaints or document a mental status examination. (Tr. at 730-32). Therefore, there is no indication in that record regarding the status of Claimant's mental impairments, and it does not constitute substantial evidence to support the ALJ's finding that Claimant's mental impairments improved.

The ALJ also erroneously found that Claimant did not have any mental status abnormalities in September, November, and December 2018. (Tr. at 26). Claimant's energy was improved during her closed period of disability, but it had worsened to poor beginning in August 2018, and Claimant's mental health provider still noted Claimant's logical, but slow, stream of thought. (Tr. at 684, 686, 688, 916, 918, 920, 922, 924, 927, 930, 933, 936, 938, 939, 942, 944, 947, 948, 951). The ALJ failed to articulate why he did not consider those to be abnormal findings, particularly when he specifically identified Claimant's logical but slow stream of thought as an abnormality during the closed period of disability. (Tr. at 19). In fact, the ALJ determined based on Claimant's slow stream of

thought and autism that Claimant had moderate limitation in understanding, remembering, and applying information, which contributed to the ALJ restricting Claimant's RFC to simple instructions and tasks. (Tr. at 19, 22). Therefore, it was antithetical for the ALJ to later claim that Claimant's slow stream of thought was not an abnormality during the period of medical improvement. Also, Claimant's poor energy was an indisputable abnormal finding that worsened during the period of medical improvement, yet the ALJ did not consider that finding.

In addition, the ALJ did not address other conflicting evidence. For example, when discussing Claimant's August 29, 2018 psychiatric appointment, the ALJ noted Claimant's generally normal mental status examination findings, which were actually, as discussed above, mostly the same as when Claimant was disabled. Not only did the ALJ create the false impression that Claimant's mental status examination findings improved, but the ALJ did not articulate any consideration of evidence within the same medical records that Claimant missed her medication one morning; was not doing crafts as much, which was her coping mechanism against self-harm; had thoughts of cutting herself; and experienced suicidal ideation and cut herself. (Tr. at 935). While an ALJ need not specifically mention every piece of evidence or notation within a medical record, the ALJ cannot select favorable portions of the record to the exclusion of contrary evidence. *Lewis v. Berryhill*, 858 F.3d 858, 869 (4th Cir. 2017). Significant conflicting evidence relating to a claimant's impairments and functions must be addressed and reconciled within the ALJ's findings.

The ALJ's analysis contains other deficits. For instance, the ALJ gave no weight to PA-C Meadows's opinion that Claimant was not stable for employment in November and December 2018 and February 2019. The ALJ determined that the opinion was

inconsistent with the fact that Claimant did not voice any mental health complaints to her primary care provider, and the provider did not note any objective abnormalities. (Tr. at 29). However, as indicated above, Nurse Huffman did not assess Claimant's mental status as part of her review of systems, instead noting that Claimant's psychological care was being provided by Southern Highlands. It is apparent from the clinical documentation that Nurse Huffman only considered and addressed Claimant's physical impairments and relied on the psychiatric experts to attend to Claimant's mental health. This was the case during Claimant's closed period of disability, as well as during her period of medical improvement. (Tr. at 724-25, 731-32, 734-35, 738, 902). Therefore, the ALJ fails to show how those records support his conclusions regarding improvement in Claimant's mental impairments.

The ALJ's analysis of Claimant's hospitalizations raises additional concerns. He distinguished Claimant's hospitalization in June 2019 from those occurring during the closed period of disability, stating that the June 2019 hospitalization was due to medication non-compliance. The ALJ concluded that the 2019 hospitalization was simply due to a lack of medication based on testimony by Claimant's mother that she believed that Claimant ran out of medication and had not taken it for two weeks preceding the hospital admission. (Tr. at 27-28). However, Claimant's providers did not attribute her exacerbation of symptoms to lack of medication. Further, Claimant's mother merely speculated that Claimant's medicine was not effective, or Claimant was hiding the pills, and Claimant at some point ran out of one of her medications for two weeks and ended up in the hospital. (Tr. at 58). However, Claimant's mother also stated that Claimant's medications required continuous adjustment, and Claimant ended up in the hospital even when taking her medications. (Tr. at 59). The ALJ's reliance on Claimant's mother's

testimony regarding the cause of Claimant's hospitalization is problematic. However, even if it was appropriate, the ALJ improperly cherry-picked and construed the testimony to support his findings.

The ALJ's disregard of Claimant's June 2019 hospitalization as a mere episode of medication non-compliance is belied by the fact that Claimant's psychiatrist changed her medications to control her symptoms. The psychiatrist documented that Claimant was very combative and had to be restrained and given injections multiple times during her admission. (Tr. at 871). He stated that, "after her medications were changed, she became much more calm and was much easier to be redirected." (*Id.*). If it was simply an episode of medication non-compliance, it is unclear why Claimant's prescriptions were changed. The ALJ should have addressed that issue.

Another inconsistency in the ALJ's analysis is that Claimant did not take medication for two weeks preceding her admission for psychiatric treatment in March 2018 during the closed period of disability. (Tr. at 19). In that case, Claimant stopped taking all of her medications, not just one medication like is noted in 2019, for two weeks because she did not feel like the medications were helping. (Tr. at 758). The ALJ cited primarily normal mental status examination findings in May 2018 and on August 1, 2018, although he determined that Claimant was disabled during that period. (Tr. at 19). The ALJ did not articulate why he did not attribute the March 2018 hospitalization to medication non-compliance like he did Claimant's June 2019 hospitalization, particularly when the ALJ made a point of discussing that Claimant was stable for months after the March 2018 hospitalization. The ALJ should have reconciled his disparate conclusions.

Finally, as Claimant argues, the ALJ failed to explain the RFC finding that Claimant could understand, remember, and carry out simple instructions and perform simple tasks

on a regular and consistent basis. The ALJ found that Claimant could not perform those functions during her closed period of disability, but she could do so once she medically improved. The ALJ stated that the RFC finding was supported by the objective medical evidence of record, Claimant's daily activities, and the opinions of the state agency physicians and psychologists. (Tr. at 29). However, the ALJ did not connect the evidence to the RFC finding regarding simple instructions and tasks. As noted, the mental status examinations that the ALJ cited did not fully support the ALJ's finding that Claimant improved. Furthermore, although the ALJ listed Claimant's activities, the ALJ did not relate them to his assessment of Claimant's mental functional abilities. Additionally, the ALJ's RFC finding was not based on any medical opinion such that the Court could ascertain the ALJ's reasoning regarding simple instructions and tasks.

The ALJ assessed that Claimant was moderately impaired in understanding, remembering, and applying information based on her reported symptoms, slow stream of thought, and diagnosis of autism spectrum disorder. (Tr. at 22). He restricted Claimant's RFC to simple instructions and tasks due to her moderate impairment in understanding, remembering, and applying information. (*Id*.). The ALJ also found, based on Claimant's function reports, slow stream of thought, and mental health diagnoses, that Claimant was moderately limited in maintaining concentration, persistence, or pace, which would limit her to simple instructions and tasks. (Tr. at 23).

However, the ALJ's foregoing assessment regarding the paragraph B criteria did not provide the necessary explanation for the change in the RFC finding, which required a more detailed assessment. It appears that the ALJ might have concluded that Claimant could not follow simple instructions and perform simple tasks during the closed period of disability due to her marked restriction in maintaining concentration, persistence, or

pace, but the ALJ did not articulate that finding or explain the basis for it. (Tr. at 16). The ALJ certainly did not explain how Claimant's concentration, persistence, or pace improved. In fact, to justify that Claimant was only moderately limited in that functional area once she medically improved, the ALJ cited evidence from both Claimant's closed period of disability and period of medical improvement, which further confused the analysis. (Tr. at 22-23).

In sum, the ALJ did not adequately explain why he concluded that Claimant could not understand, remember, and carry out simple instructions and perform simple tasks during the closed period of disability, but she could do so after she medically improved. The error was clearly not harmless, as the ALJ's finding related to simple instructions and tasks was the deciding factor in the step five conclusion regarding whether Claimant could work.

For all of the above reasons, the undersigned **FINDS** that the ALJ's decision that Claimant medically improved is not supported by substantial evidence. Accordingly, the undersigned **RECOMMENDS** that the Commissioner's decision be **REVERSED** and that this case be **REMANDED** so that the ALJ may reexamine or elaborate upon his finding of medical improvement.

### B. ADHD, Autism Spectrum Disorder, and Borderline Personality Disorder

Claimant next argues that the ALJ focused on her depression and did not properly consider her ADHD, autism spectrum disorder, and borderline personality disorder. She cites her mother's testimony concerning her day-to-day functioning, including her educational limitations and the fact that she needs supervision to meet basic daily demands such as caring for personal hygiene and taking her medication. (ECF No. 14 at

15-16). Claimant also references Dr. Abel's opinion that she lacked capacity to meet essential requirement for her health, care, safety, habitation, or therapeutic needs without assistance or protection. (*Id.* at 17). Claimant argues that the ALJ swiftly dismissed Dr. Abel's opinion on the basis that it was rendered during a period of symptom exacerbation, but the opinion was partly based on Claimant's intellectual and developmental disabilities along with an autism spectrum disorder, conditions which are not typically subject to periods of significant waxing and waning. (*Id.* at 18). Finally, Claimant cites her consultative examination in which Ms. Robinson diagnosed her with ADHD, as well as a possible learning disorder, and noted her issues with concentration, persistence, pace. (*Id.* at 18-19).

The ALJ determined that Claimant's ADHD, autism spectrum disorder, and borderline personality disorder were severe impairments. (Tr. at 15). At step three, the ALJ performed the special technique to evaluate Claimant's functional abilities in the broad paragraph B criteria, citing Claimant's function reports, testimony, and medical records. (Tr. at 22-24). In the RFC analysis, the ALJ acknowledged Claimant's testimony regarding intellectual impairment and special education classes and her mother's testimony that Claimant needed help with hygiene, meals, and medication. (Tr. at 25). The ALJ considered Claimant's individualized education program (IEP), Dr. Abel's opinion that Claimant had significant cognitive and functional limitations, and Claimant's consultative examination report.  (Tr. at 18, 25, 28).

However, as previously discussed, the ALJ failed to adequately explain Claimant's mental functional ability to understand, remember, and carry out instructions and the reasons that the severity of her mental conditions medically improved. The evidence concerning Claimant's ADHD, autism spectrum disorder, and borderline personality

disorder was clearly relevant to those issues, but the ALJ did not properly address the effects of those impairments on Claimant's RFC. Further, as Claimant argues, the ALJ did not consider Dr. Abel's opinion that Claimant was incapacitated due to intellectual and functional disabilities and autism, as well as severe depression. The ALJ gave little weight to Dr. Abel's opinion, in part, because it was rendered during a "period of symptom exacerbation." (Tr. at 20). However, that explanation seems to focus only on Claimant's depression and overlooks Claimant's other mental impairments.

The undersigned **FINDS** that the ALJ's analysis of Claimant's ADHD, autism spectrum disorder, and borderline personality disorder is not supported by substantial evidence, and the ALJ should reconsider or elaborate upon his analysis of those impairments on remand.

### C. Side Effects of Medication

Finally, Claimant argues that the ALJ did not consider the side effects of her medication, such as excessive sedation. The undersigned agrees with Claimant's contention. Claimant's providers repeatedly documented that Claimant's psychiatric medication caused excessive sedation. From August 10, 2017, to July 6, 2018, Claimant's energy was improved. (Tr. at 684, 686, 688, 916, 918, 920, 922, 924, 927, 930). However, beginning on August 1, 2018, Claimant's energy worsened to poor. (Tr. at 933, 936, 939, 942, 944, 948, 951). The ALJ did not properly address those mental status examination findings or explain how they factored into his determination that Claimant medically improved and had a less restrictive RFC. The undersigned **FINDS** that the ALJ's analysis of the side effects of Claimant's medication is not supported by substantial evidence, and the ALJ should reconsider or elaborate upon the relevant evidence and functional impact of the side effects of Claimant's medication on remand.

## VIII.  **Recommendations for Disposition**

Based on the foregoing, the undersigned United States Magistrate Judge respectfully **PROPOSES** that the presiding District Judge confirm and accept the findings herein and **RECOMMENDS** that the District Judge **GRANT** Plaintiff's request for judgment on the pleadings, (ECF No. 13), to the extent that it requests remand of the Commissioner's decision; **DENY** Defendant's request to affirm the decision of the Commissioner, (ECF No. 15); **REVERSE** the final decision of the Commissioner; **REMAND** this matter pursuant to sentence four of 42 U.S.C. § 405(g) for further administrative proceedings consistent with this PF&R; and **DISMISS** this action from the docket of the Court.

The parties are notified that this "Proposed Findings and Recommendations" is hereby **FILED**, and a copy will be submitted to the Honorable David A. Faber, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and three days (if received by mail) from the date of filing this "Proposed Findings and Recommendations" within which to file with the Clerk of this Court, specific written objections, identifying the portions of the "Proposed Findings and Recommendations" to which objection is made, and the basis of such objection. Extension of this time period may be granted by the presiding District Judge for good cause shown. Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Judge and a waiver of appellate review by the Circuit Court of Appeals. *Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir. 1989); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984). Copies of such objections shall be provided to

the opposing party, Judge Faber, and Magistrate Judge Eifert.

The Clerk is directed to file this "Proposed Findings and Recommendations" and to provide a copy of the same to counsel of record.

**FILED:** August 6, 2021

Cheryl A. Eifert
United States Magistrate Judge